## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number: **17-03973-jw**

## ORDER ON OBJECTION OF CHARLESTON CAPITAL CORPORATION TO DEBTOR'S PROPOSED CHAPTER 13 PLAN

The relief set forth on the following pages, for a total of 15 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**12/18/2017**



*/s/ John E. Waites*
US Bankruptcy Judge
District of South Carolina

Entered: 12/18/2017

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 17-03973-JW |
| | Chapter 13 |
| Phillip Tumminia, | |
| Debtor. | |

**ORDER ON OBJECTION OF CHARLESTON CAPITAL CORPORATION
TO DEBTOR'S PROPOSED CHAPTER 13 PLAN**

This matter comes before the Court to consider confirmation of the debtor Phillip Tumminia's ("Debtor") Amended Chapter 13 plan filed on October 18, 2017 ("Plan"). Charleston Capital Corporation, a secured creditor of the Debtor ("Creditor"), filed a timely Objection to the Plan and Certification of Interest Rate on October 18, 2017 (collectively "Objection"). The Debtor filed a response to the Objection on October 20, 2017. The parties filed their Joint Statement of Dispute on October 23, 2017 ("Joint Statement").

After considering the arguments of counsel, the testimony of Tom Ervin, owner and principal of Creditor, and other matters properly before the Court, and based upon the applicable legal authorities, the Court makes the following Findings of Fact and Conclusions of Law.[1]

**FINDINGS OF FACT**

The following facts are undisputed:

1.  On May 4, 2016, the Debtor and Kathleen A. Breunig ("Co-Debtor") executed and delivered to Creditor a short term promissory note in the original principal amount of $55,000 ("Note"). The Note provides:

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

1

      a)     for interest to be calculated at the rate of twelve percent (12%) *per annum* on the outstanding balance;

      b)     that in the event of a default, the interest rate on the outstanding balance "shall be increased" to the default rate of 18% *per annum*; and

      c)     that if the Note is placed in the hands of an attorney for collection, "all costs of collection, including a reasonable sum for attorney's fees shall be added [to the Note] as attorney's fees and secured and collectible as the principal hereof."

    2.     To secure the Note and the debt evidenced thereby, and contemporaneous with execution of the Note, on May 4, 2016, the Debtor and Co-Debtor executed and delivered to Creditor a mortgage ("Mortgage") pursuant to which they granted Creditor a mortgage lien on a parcel of real property and the improvements thereon with the address of 7124 Indigo Palms Way, Johns Island, SC 29455 ("Property").[2] The Mortgage was recorded in the Charleston County Records Office on May 9, 2016 in book 552, page 396.

    3.     The Note matured by its terms prepetition on May 1, 2017.

    4.     The Debtor filed a petition under chapter 13 of the Bankruptcy Code on August 9, 2017. The Debtor's Schedules indicate that the Property serves as the Debtor's principal residence, and that the Property has a value of $169,000.

    5.     Creditor filed a proof of claim on September 29, 2017 ("Claim"), indicating that as of the petition date, there was due and owing on the Note the sum of $66,182.95.[3] The Claim also states that when the case was filed, the annual interest rate on the Note was the default rate of 18%. The Claim does not include postpetition interest, attorney's fees, charges, or other postpetition costs. No objection has been filed to the Claim.

---

[2] The Debtor's bankruptcy schedules ("Schedules") indicate that the Property is jointly owned by the Debtor and Co-Debtor.

[3] It appears from the attachments to the Claim that the Debtor last made a payment on the Note in November 2016.

6.  There is approximately $103,000 of equity in the Property over and above Creditor's Claim.[4]

7.  Co-Debtor is an individual protected by the co-debtor stay of 11 U.S.C. § 1301.[5]

8.  The Debtor's Plan proposes the following treatment for Creditor's claim:

> Long term or mortgage debt. Curing default: 11 U.S.C. 1322(b)(3) and/or (5):
>
> a.  Arrearage payments. The trustee shall pay the arrearage as stated in the creditor's allowed claim or as otherwise ordered by the Court to <u>Charleston Capital Corporation</u> at the rate of *$650.00 or more,* for Condominium <u>located at 7124 Indigo Palms Way, Johns Island, SC 29455,</u> *including 5.25%* <u>interest</u>. The creditor shall apply trustee payments solely to those designated arrearages, i.e., those arrearages accruing before the month specified in (b) below. For so long as the debtor complies with this plan, a creditor may not declare a default based on any payment delinquency to be cured by this paragraph and the creditor shall not impose any post-petition fee on account of any arrearage paid by the trustee.
>
> b.  Maintenance of regular non-arrearage payments. Beginning N/A *(the loan is full matured and the <u>payments made to the creditor within this plan shall satisfy the balance of the loan and the creditor shall satisfy the note and mortgage and release this lien upon the discharge of this reorganization)* . . . .</u>

(Emphasis in original).[6]

9.  Although the Plan uses the section of the District's form plan designated for "cure and maintain treatment," the language indicates an intent to pay "the balance of the loan over the term of the plan." Furthermore, in his response to the Objection and at the hearing, the Debtor clarified that his intent was to utilize the provisions of § 1322(c)(2), and to pay the Claim in full

---

[4] In addition to Creditor, the Schedules indicate that Indigo Hall at Kiawah River Estates has an interest in the Property by virtue of unpaid homeowners' association dues in the amount of approximately $5,411.00. As of the date of this Order, no claim has been filed by or on behalf of Indigo Hall at Kiawah River Estates.

[5] Hereinafter, all references to provisions under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, shall be by section number only.

[6] The Court notes that the District's former form Chapter 13 plan did not clearly provide a method to identify § 1322(c)(2) claim treatment. However, it may have been appropriate to include this § 1322(c)(2) clam treatment in section IV(B)(5) of the District's former plan.

3

through the Plan over a period of sixty (60) months. Therefore, the Court will consider the application of § 1322(c)(2) to this case.[7]

10. In its Objection (filed in conformity with SC LBR 3015-6), Creditor indicated its belief that the market rate of interest for similar loans in Creditor's lending market would be a standard interest rate of 12%, and a default interest rate of 18%.

11. In support of its Objection, Creditor offered the testimony of Thomas Irvin, who testified at the hearing that:

    a) Creditor is an asset-based lender with approximately $5 million dollars in assets. Creditor is not a traditional lender, but a lender of "last resort" for customers who have tried to get less expensive loans elsewhere but were unable to do so.

    b) Creditor offers its customers non-credit underwritten, short-term secured loans of no more than one (1) year in length, with interest at a standard rate of no less than 10% and as high as 16%. The average interest rate on loans in Creditor's loan portfolio is 12%. Creditor would never offer a loan with a standard interest rate of 5.25%.

    c) Creditor calculates the interest charged on a loan based on the ratio of the amount borrowed versus the value of the collateral offered ("LTV"). If the LTV is 20%, then Creditor offers its borrower a standard interest rate of 10% *per annum*. If the LTV is 60 to 70%, Creditor offers its borrower a standard interest rate of between 12-15% *per annum*.

    d) In addition to looking at the LTV, when calculating the standard interest rate, Creditor also takes into consideration the type of property being offered as collateral.

    e) Creditor first came into contact with the Debtor through an attorney, who contacted it about the Debtor's financial problems. The Debtor was in default with a lender who held a lien on the Property, and was facing foreclosure. The Debtor sought a short-term loan to pay off the existing debt, and to give him the opportunity to prepare and list the Property for sale with a realtor, so the equity could be preserved. Creditor extended the Debtor and Co-Debtor a loan pursuant to the terms set forth in the Note and Mortgage. The Debtor and Co-Debtor listed the Property, and had a contract to

---

[7] Although the Joint Statement does not cite § 1322(c) with specificity, as legal authorities in support of his position, the Debtor cited to *In re Brown*, 428 B.R. 672 (Bankr. D.S.C. 2010) and *In re Sanders*, C/A No. 14-2672-jw, slip op. (Bankr. D.S.C. Sept. 26, 2014), two cases from this Court that address the use of § 1322(c)(2) to pay over the term of a plan the total outstanding indebtedness of a mortgage that matured or was accelerated prepetition. At the hearing, counsel for both parties addressed the application of § 1322(c)(2) and the related case law, but the parties' primary focus was on the proper interest rate to be paid to Creditor under the Plan.

sell the Property for $169,000, but the Debtor and/or Co-Debtor elected to terminate the contract.[8]

11. The Debtor offered no testimony or evidence on the appropriate market rate of interest, choosing instead to rely on the District's presumptive interest rate of 5.25% established pursuant to SC LBR 3015-6 and Amended Operating Order 09-02.

## **CONCLUSIONS OF LAW**

The parties' Joint Statement identifies the following as the issues to be decided by the Court:

a. Whether Charleston Capital is entitled to contract interest rate on a fully matured mortgage note.

b. If Charleston Capital is not entitled to the contract interest rate, is it entitled to a market rate and what is that rate?

c. As the loan is over secured, is Charleston Capital entitled to recover attorney's fees and costs?

d. The Proposed Chapter 13 Plan calls for the Note and Mortgage to be satisfied upon completion of all plan payments. The obligation is owed by a co-debtor. As the proposed Plan does not provide for payment in full of all interest and costs, is Charleston Capital required to satisfy the Note and Mortgage if the debtor makes all payments under the proposed Plan?

While the Debtor agrees that that Creditor is entitled to interest on its Claim, the Debtor believes that the Objection should be overruled because his proposal to pay Creditor the District's presumptive interest rate of 5.25% meets the requirements of SC LBR 3015-6 and Amended Operating Order 09-02 and, in Debtor's view, also satisfies the requirement under § 1325(a)(5) that the Plan pay Creditor the present value of its Claim. The Debtor also argues that it would be inequitable to his other creditors to give Creditor a higher rate of interest on payments made under the Plan, or to pay Creditor's attorney's fees and costs. Finally, the Debtor argues that

---

[8] This testimony is confirmed by the Schedules, which list an executory contract with John and Linda Howe for the sale of the Property. *See* Schedule G filed August 9, 2017 at ¶ 2.2. The Schedules indicate the Debtor's intention to reject this contract, as well as the executory contract with a realtor. *Id.* at ¶ 2.

5

upon his completion of all payments under the Plan, Creditor should be required to satisfy the Note and Mortgage.

Creditor argues that as the holder of a defaulted, fully matured, and oversecured mortgage lien on property that serves as the Debtor's residence, it is entitled to the default contractual rate of interest pursuant to § 1322(b)(2) and *Anderson v. Hancock,* 820 F.3d 670 (4th Cir. 2016).[9] In the alternative, Creditor asserts that it is entitled to a market rate of interest which is in excess of the 5.25% provided for in the Plan. Creditor also argues that as an oversecured creditor, it is entitled to attorney's fees and costs. Finally, Creditor maintains that if the Plan does not satisfy the entire amount owed under the Note, Creditor should not be required to satisfy the Note and Mortgage upon the Debtor's completion of his plan payments, and Creditor should be permitted to pursue the Co-Debtor for any remaining, unpaid portion of the obligations arising under the Note and Mortgage.

1. **Interest Rate on Creditor's Claim.**

At issue in this case is the interplay between § 506(b) (which provides that an oversecured creditor is entitled to recover postpetition interest, fees, costs, and charges), § 1322(c)(2) (which allows some modification of a loan secured only by a security interest in real property that is the debtor's principal residence if the loan is one that matures before the final payment is due under the debtor's plan), and § 1325(a)(5)(B) (which mandates that a secured creditor being paid over time in a chapter 13 plan receive monthly payments in an amount sufficient to provide the secured creditor with the present value of its claim).

---

[9] In *Anderson*, in the context of a "cure and maintain" plan proposed to address the debtors' prepetition default under a **long-term mortgage loan**, the Fourth Circuit held that § 1322(b)(2) precluded a debtor from modifying the loan to reduce the interest rate from the default rate to the pre-default rate of interest. *Anderson v. Hancock*, 820 F.3d 670 (4th Cir. 2016) (The anti-modification provision of §1322(b)(2) "prohibits any fundamental alteration in debtor's obligations," under a long term home mortgage loan, including attempts to "tamper" with the interest rate contained in the loan documents.). However, the Court noted that its decision did not apply to treatment of a claim under § 1322(c)(2). *Id.* at 673. ("Claims secured by security interests in the debtor's principal residence may be modified only if 'the last payment on the original payment schedule' is due before the due date of the last payment under the plan, 11 U.S.C. 1322(c)(2), an exception which does not apply here.").

6

It is undisputed that Creditor's claim is oversecured. It is further undisputed that the Note provides for an award of reasonable attorney's fees and costs of collection, as well as other fees and charges. Therefore, as a matter of law pursuant to § 506(b), Creditor is entitled to postpetition interest at the Note's default rate of 18%,[10] as well as postpetition attorney's fees, costs, and charges. 11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose."); *In re Sanders*, C/A No. 14-2672-jw, slip op. at 4 (Bankr. D.S.C. Sept. 26, 2014).

However, Creditor's right to receive postpetition interest, fees, costs, and charges pursuant to § 506(b) does not, as Creditor argues, control the interest rate Creditor is entitled to receive upon confirmation of the Plan. As explained by one commentator:

> The oversecured claim holder's entitlement to postpetition interest, fees, costs and charges in § 506(b) is sometimes confused with the right of a secured claim holder to receive the present value of its allowed secured claim at confirmation under § 1325(a)(5)(B). The interest provided to a secured claim holder to preserve value "as of the effective date of the plan"[11] under § 1325(a)(5)(B) is not allowed as part

---

[10] There is a presumption that Creditor is entitled to collect postpetition interest until confirmation at the 18% default rate provided for in the Note. *See, e.g., In re Southland Corp.,* 160 F.3d 1054 (5th Cir. 1998) (under § 506(b), the default rate of interest is normally allowed); *In re Dixon*, 228 B.R. 166, 172 (W.D. Va. 1998) ("The majority of jurisdictions allow, or at least give a presumption to the allowability of, default rates of interest, provided that the rate is not unenforceable under applicable nonbankruptcy law." (Internal quotation marks and citation omitted)). However, the presumption in favor of the contract rate does not foreclose this possibility that a party in interest may file an objection to the Claim to challenge the 18% default rate of interest on the grounds that it is in the nature of a penalty, is unenforceable under state law, or that its payment would be inequitable. *See In re Dixon*, 228 B.R. at 173 ("The facts and equities specific to each case thus prove determinative in the analysis of default rates [and within] this analysis, the contract default rate is neither irrelevant nor predictive [and what] 'emerges from the post-Ron Pair decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations.'" (*citing In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994))).

[11] As explained in *Lundin on Chapter 13*:

> The phrase "value, as of the effective date of the plan" means that the stream of future payments must be discounted to a present value that is not less than the allowed amount of the secured claim. The accepted way to satisfy the present value requirement in § 1325(a)(5)(B)(ii) is to determine the allowed amount of the secured claim and then apply an appropriate interest rate to guarantee that

7

> of the creditor's claim under § 506(b) but is calculated and added to payments [made] under the plan after confirmation. . . . The rate of interest required to provide an allowed secured claim holder present value under § 1325(a)(5)(B) may or may not be the rate of interest allowed as part of an oversecured claim under § 506(b).

Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, § 116.1, at ¶ 2 (4th ed. 2004); *see also In re Montemayor*, C/A No. 10-36990, 2010 WL 5315814, at *1 (Bankr. S.D. Tex. Dec. 20, 2010) (Noting that the creditor "attempts to conflate the claim allowance requirement of §506(b) with a confirmation requirement of § 1325. That reflects a misunderstanding of the function of these two sections of the Bankruptcy Code."). Thus, while § 506(b) "allows an oversecured creditor to recover postpetition interest as part of its allowed claim at the contract rate," § 506 applies only through confirmation. *In re Sanders*, C/A No. 14-2672-jw, slip op. at 4–5 (Bankr. D.S.C. Sept. 26, 2014); *Rake v. Wade,* 508 U.S. 464, 468 (1993) ("506(b) applies only from the date of filing through the confirmation date"); *see In re Hugee*, 54 B.R. 676, 678–79 (Bankr. D.S.C. 1985) (The creditor is entitled to receive the contract rate of interest until the effective date of the plan—at which time the accumulated interest becomes a part of the allowed secured claim.). After confirmation, the interest paid to Creditor is designed to preserve the present value of the Creditor's Claim and must be provided pursuant to § 1325(a)(5)(B), and calculated as instructed by the Supreme Court in *Till v. SCS Credit Corporation*, 541 U.S. 465 (2004). *Sanders*, C/A. No. 14-2672-jw, slip op. at 8 (creditor, who's fully matured loan is being paid under the plan pursuant to § 1322(c)(2) is entitled to receive interest under the plan calculated pursuant to *Till* to provide it with the present value of its allowed claim as of the plan's effective date); *In re Edwards*, C/A No. 12-29524 WIT, 2013 WL 1310553 (Bankr. D. Utah Mar. 26, 2013) (An oversecured creditor is

---

the present value of payments through the plan will equal or exceed the allowed amount of the secured claim.

Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, § 111.1, at ¶ 2 (4th ed. 2004).

8

entitled to contract interest rate only until confirmation; thereafter, *Till* determines the interest rate.); *In re Highfield*, C/A No. BK09-43033-TLS, 2010 WL 1433161, at *2 (Bankr. D. Neb. Mar. 19, 2010) ("[A]s an over-secured creditor, [creditor] is entitled to its contract rate of interest (as well as its fees and costs) through the date of confirmation . . . and the [*Till*] rate thereafter.").

In *Till*, which was a chapter 13 case, the Supreme Court held that the appropriate method for determining the adequate rate of interest on a loan crammed down[12] pursuant to § 1325(a)(5)(B) is to use a "prime-plus" formula, calculated using the current national prime rate of interest plus a risk adjustment. The risk adjustment is determined based upon "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479. "[T]he general consensus among courts is that a one to three percent adjustment to the prime rate is appropriate, with a 1.00% adjustment representing the low risk debtor, and a 3.00% adjustment representing a high risk debtor. . . ." *In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 795 (Bankr. D.S.C. 2012); *Till*, 541 U.S. at 480–81. The evidentiary burden regarding the market rate is "squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing. . . ." *Till*, 541 U.S. at 479; *see also* SC LBR 3015-6.[13]

Creditor argues that because its claim is secured only by a lien on the Debtor's principal residence, the terms of the Note cannot be modified to reduce the interest rate Creditor is paid through the Plan. Creditor is correct that § 1322(b)(2) precludes any modification of a claim

---

[12] "'Cram down' is a term that refers to confirmation of a chapter 13 plan over the objection of the holder of a [secured] claim." *In re Stringer,* 608 B.R. 668, 672 (Bankr. N.D. Miss. 2014) (*citing Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957, (1997), and *In re Wright*, 338 B.R. 917, 919 (Bankr. M.D. Ala. 2006)).

[13] In this District, the Court has established by Operating Order 5.25% as the presumed effective interest rate ("Periodic Interest Rate") to be paid to secured creditors in chapter 13 plans. There is a rebuttable presumption that the Periodic Interest Rate is reasonable for purposes of plan confirmation. *See* SC LBR 3015-6. If, however, a creditor wishes to challenge the Periodic Interest Rate, the creditor must file a timely objection, and the Court will conduct an evidentiary hearing to determine the appropriate interest rate using the methodology set forth in *Till*.

secured only by a lien on a debtor's residence when a long-term, secured claim is being paid pursuant to a plan using §§ 1322(b)(3) and/or (5). 11 U.S.C. § 1322(b)(2) ("Subject to subsections (a) and (c) . . . the plan may . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ."); *see Anderson*, 820 F.3d at 671 (By virtue of § 1322(b)(2), a plan that proposes a cure of a prepetition mortgage default of a long-term debt under §§ 1322(b)(3) and (5) cannot be used as a means to "to bring post-petition payments back down to the initial rate of [pre-default] interest.").

However, as explained by this Court in *In re Sanders*, "§ 1322(c)(2) allows a debtor to modify mortgages on which the last payment on the original payment schedule is due before the [final plan payment] by proposing in the plan to pay the mortgage creditor in full over the course of the bankruptcy," at an interest rate designed to provide creditor with the present value of its claim, calculated in accordance with *Till*. *Sanders,* C/A No. 14-2672-jw, slip op. at 6–7; *see Anderson,* 820 F.3d at 673 (prohibition on modifying a claim secured only by a lien on a debtor's principal residence does not apply to a claim that is subject to payment pursuant to § 1322(c)(2)); *In re Brown*, 428 B.R. 672 (Banker. D.S.C. 2010) (Section 1322(c)(2) permits a debtor to pay the total outstanding indebtedness of a mortgage that matured or was accelerated prepetition over the term of the plan.); *In re Hubbell*, 496 B.R. 784, 789-90 (Bankr. E.D.N.C. 2013) (The bankruptcy code permits modification of interest rate on claims subject to modification under § 1322(c)(2) to a rate that is more favorable to the debtor than that provided for in the original loan documents.); *see also In re Olmo-Claudio*, C/A No.: 8–16–71740–ast, 2017 WL 3835798 (Bankr. E.D.N.Y. August 30, 2017) (An oversecured claim secured only by the debtor's residence, subject to a note that matured prepetition, may be modified by paying the loan balance over the life of the plan, with the interest rate calculated pursuant to *Till.*); *In re Kulik*, C/A No. 16-12176-BKC-AJC, 2017

10

WL 1032500, at *2-3 (Bankr. S.D. Fla. March 1, 2017) (*Till* formula approach should be used to determine appropriate rate of interest for an oversecured loan that matured prepetition.). Thus, because the Note matured by its terms prepetition, and the Debtor intends to treat the debt under § 1322(c)(2),[14] the terms of the Note may be modified in accordance with § 1322(c)(2), the Claim may be paid over the term of the Plan and, upon confirmation, Creditor may be paid interest not at the contract rate, but at a rate designed to provide Creditor with the present value of the Claim.

In support of its Objection, and in an effort to meet its evidentiary burden on the interest rate issue, Creditor offered the testimony of Mr. Irvin regarding the market rate of interest to be applied to this loan. The Court found Mr. Irvin's testimony to be informative regarding both the calculation of interest on loans offered by Creditor and the circumstances surrounding Creditor's loan to Debtor. However, while he advocated a market rate interest of between 10 and 15%, Mr. Irvin's testimony did not address other factors that must go into the Court's analysis, including the circumstances in this case and the duration and feasibility of the Plan. Nor did Mr. Irvin's calculations acknowledge the fact that the Debtor's repayment of the Claim will be subject to the supervision of the Chapter 13 Trustee and this Court which, in and of itself, reduces the risk of non-payment. *See Till*, 541 U.S. at 475 and n.12 ("On the one hand, the fact of the bankruptcy establishes that the debtor is overextended and thus poses a significant risk of default; on the other hand, the postbankruptcy obligor is no longer the individual debtor but the court-supervised estate, and the risk of default is thus somewhat reduced.").

---

[14] Section 1322(c)(2) provides:

> Notwithstanding subsection (b)(2) and applicable nonbankruptcy law. . .in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

(Emphasis added).

The Court has reviewed the record in this case, including the Debtor's schedules, Plan, and other matters properly before it. Based upon the testimony of Mr. Irving, together with the circumstances of the case,[15] the nature of the Property and the significant equity therein, and the duration and feasibility of the plan, and taking judicial notice of the national prime rate of interest,[16] the Court finds that the appropriate market rate of interest in this case is 6.00%.[17]

Therefore, Creditor may charge for postpetition attorney's fees and costs, as well as postpetition interest at the default rate of 18% until confirmation and thereafter, the interest rate paid by the Debtor under the Plan will be 6%.

**2.    Impact of the Plan on the obligations of the Co-Debtor.**

Upon the filing of a Chapter 13 petition, § 1301 of the Bankruptcy Code imposes a "co-debtor stay," that precludes a creditor from taking any action "to collect all or any part of a consumer debt of the debtor from any individual that is liable on such debt with the debtor. . . ." 11 U.S.C. § 1301. The purpose of the co-debtor stay is "to relieve the debtor from indirect pressure to pay certain creditors in full immediately, in spite of the pendency and the supposed protection of the Chapter 13 case," and any protection a co-debtor receives as a result of the co-debtor stay is incidental to the statute's primary goal of protecting the chapter 13 debtor. *Southeastern Bank v.*

---

[15] Circumstances of the case considered by the Court that weighed in favor of a lower risk adjustment include the Debtor's income, which appears to be derived from stable sources (social security and payments from a pension plan), and the fact that the Debtor has proposed a 60-month plan. Circumstances of the case considered by the Court that weighed in favor of a higher risk adjustment include approximately $16,000 in priority tax debt and the fact that it appears that the Debtor contemplates increasing his Plan payment after the first 12 months from increased income from contingent sources (specifically, the Debtor's ability to fund increased plan payments appears to be dependent upon his success in obtaining increased benefits from the Department of Veterans Affairs, and on favorable outcomes in an action seeking compensation for "asbestos related injuries," and in an as yet to be filed action against the Department of the Navy). Finally, while the monthly financial contribution from the Co-Debtor currently weighs in favor of a lower risk adjustment, Co-Debtor's monthly contribution to the Debtor's income appears voluntary.

[16] *See* Fed. R. Evid. 201.

[17] As noted by the Supreme Court, there is no true "free market of willing cramdown lenders" because "every cramdown loan is imposed by a court over the objection of the secured creditor." *Till v. SCS Credit Corp.*, 541 U.S. at 477, n.14.

12

*Brown*, 266 B.R. 900, 907 (S.D. Ga. 2001); *see* H.R. Rep. No. 95-595, at 122 (1977) (reprinted in 1978 U.S.C.C.A.N. 5787, 6083) ("[The co-debtor stay] is designed only to protect the principal debtor, not the co-debtor. Any protection of the co-debtor is incidental."); *see also Smith v. Capital One Bank (USA), N.A.*, 845 F.3d 256, 262 (7th Cir. 2016) (The co-debtor stay "is not meant to shield third parties from facing judgments on their *own* debts." (Emphasis in original)).

Likewise, § 1301 was not designed or intended to affect a co-debtor's liability or a creditor's substantive rights under its loan documents. Thus, notwithstanding the co-debtor stay, a creditor is entitled to recover the full amount provided for in the co-signed loan documents, and any portion of the debt that is not paid by the debtor through the plan may be recovered from the co-debtor. *In re Butler*, 242 B.R. 553, 557 (Bankr. S.D. Ga. 1999); *Cain v. Cadle Co.*, C/A No. 5:06-CV-182 MCR/EMT, 2007 WL 2852345, at *3 (N.D. Fla. Sept. 30, 2007) (The co-debtor stay "was designed to 'assure creditors that they would receive the benefit of their bargains with [co-debtors] and would not be substantially prejudiced by the [co-debtor] stay.'" (*citing Int'l Harvester Emp. Credit Union, Inc. v. Daniel*, 13 B.R. 555, 557-58 (Bankr. S.D. Ohio 1981)); *Se. Bank v. Johns* (*In re Johns*), Adv. Pro. No. 01–2012, 2001 WL 36390714 (Bankr. S.D. Ga. August 1, 2001) (if the debtor's plan does not propose to pay the co-signed consumer loan in full according to its terms, then the creditor is entitled to relief from the co-debtor stay to pursue the co-debtor for any amounts not paid by the debtor under the chapter 13 plan).

When a plan addresses a co-signed debt, a chapter 13 debtor has one of two options: first, the debtor may pay the creditor's claim as filed, and thereby protect the co-debtor from future suit. In the alternative, the debtor may object to or otherwise challenge the creditor's claim, and elect not to pay the claim as filed and in full in his plan. In that event the debtor:

> opens the door for the creditor to seek [payment of] any part of its claim not paid under the debtor's plan from the co-debtor. The debtor cannot . . . simultaneously

13

   limit his own liability on the debt while also extending the protections of the co-debtor stay to the full amount of the creditor's proof of claim. Simply put, the debtor cannot have it both ways.

*Cain*, 2007 WL 2852345 at *3 (internal footnotes omitted).

  In this case, §§ 1322(c)(2) and 1325(a)(5) would permit the Debtor to confirm a chapter 13 plan that provides for interest on Creditor's claim after confirmation at a rate less than that provided for in the Note. However, the Plan cannot shield the Co-Debtor from her liability for sums not paid by the Debtor through the Plan. Nor can the Plan expand the protections of the Debtor's future Chapter 13 discharge to the Co-Debtor, or impair Creditor's rights by requiring Creditor to prematurely satisfy its Note and Mortgage. In short, the Debtor cannot simultaneously avoid paying Creditor in full and force Creditor to forego its bargained for rights against the Co-Debtor. Therefore, the Debtor is prohibited from including language in the amended plan that requires Creditor to satisfy its Note and Mortgage upon the completion of payments under the Plan.

## CONCLUSION

  For the reasons stated herein, the Plan before the Court cannot be confirmed. Creditor's Objection is sustained in part and denied in part. The Debtor shall have ten (10) days from the date of the entry of this Order to file a second amended plan. Should the second amended plan provide for treatment of the Claim[18] pursuant to § 1322(c)(2), then the second amended plan should be consistent with the provisions of this Order.

  **AND IT IS SO ORDERED.**

---

[18] The Court suggests that counsel for Creditor immediately file an affidavit showing its current postpetition attorney's fees, costs, charges, and postpetition interest, for consideration by the Debtor as he prepares his second amended plan. Thereafter, Creditor may supplement the affidavit to include any further postpetition sums incurred up to the time of any further confirmation hearing.

14